IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 APR 30  PM 2: 00

U.S. DISTRICT COURT
N.D. OF ALABAMA

JULIELLA PARSONS,                      )
                                       )
       Plaintiff,                      )
                                       )
v.                                     )      CV-01-JEO-3359-S
                                       )
HOOVER CITY BOARD                      )
OF EDUCATION,                          )
                                       )
       Defendant.                      )

**ENTERED**

APR 3 0 2004

## MEMORANDUM OPINION

Before the court is the motion for summary judgment of defendant Hoover City Board of

Education (hereinafter "the defendant" or "the Board") on the claims of the plaintiff, Juliella

Parsons (hereinafter "the plaintiff" or "Parsons"). (Doc. 14).[1] The plaintiff's complaint alleges

discrimination in violation of the American with Disabilities Act (hereinafter "ADA") and the

Age Discrimination in Employment Act (hereinafter "ADEA"), retaliation and breach of

contract.[2] (Doc. 1). Having considered the parties' arguments, and evidence in support thereof,

along with the relevant case law, the court finds that the defendant's motion is due to be granted

for the reasons set out herein.

## FACTUAL BACKGROUND[3]

The plaintiff asserts that the defendant discriminated against her in violation of the ADA

---

[1] References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

[2] The plaintiff concedes that her breach of contract claim is due to be dismissed. (Doc. 20, p. 29, n.16).

[3] The facts set out below are gleaned from the parties' submissions and they are viewed in a light most favorable to the non-moving party. They are the "facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

27

and the ADEA, retaliated against her, and breached its contract with her when it did not renew

her employment at the end of the 1999-2000 school year. (Doc. 1, ¶¶ 25-36). Additionally, the

plaintiff asserts that the defendant failed to provide her with a reasonable accommodation in

violation of the ADA. (Doc. 1, ¶ 26).

### The Hoover City Board of Education and Simmons Middle School

The Board's superintendent is Jack Farr and the Assistant Superintendent is Connie

Williams. (Doc. 15, p. 2). Simmons Middle School is within the Board's school district. Carol

Barber, the principal at Simmons, reports directly to Farr and Williams.

Simmons has two Assistant Principals. At the time period relevant to this action,

Assistant Principal Christine Shipley was responsible for overseeing the seventh grade and the

physical education department and Assistant Principal Marilyn Jones was responsible for

overseeing the eight grade and the encore team (teachers of elective classes such as art, music,

drama, and foreign language). Both Shipley and Jones reported directly to Barber.

### Plaintiff's Employment with Simmons Middle School

In August 1998, the plaintiff interviewed with Barber for an art teacher position at

Simmons. (Doc. 15, p. 2; Doc. 20, p. 4, ¶ N). Parsons completed her masters in creative writing

in 1991 and her Master of Secondary Education in Language Arts in 1992. While working on

her masters, she was a graduate teaching assistant in the English Department at the University of

Alabama. Parsons' teaching experience between completion of her masters in 1992 and her

employment at Simmons in 1998 consisted of the following: one semester at Three Rivers

Community College in Missouri (1992); art teacher for the University of Alabama Youth Art

Program (1992-1995); Director of the Drama Department at Coral Springs High School, teaching

2

theater arts, play writing, and speech (1994-1995); Writing Skills lab professor at the University

of Alabama - Birmingham (1996-1997); fundamentals of English grammar, American Literature,

Speech, and an art education course for teachers at Lawson State Community College

(1996-1997); and American Literature, British Literature, and Freshman composition at Shelton

State Community College (1992-1994).[4]  (Doc. 16, Tab 1, Def. Ex. 3).

      During her interview with Barber, the plaintiff informed Barber that she had been injured

in a car accident and that she had surgery on her left arm as a result of that injury.[5]  The plaintiff

then told Barber that she was doing much better at that time and would be able to perform the

duties required as an art teacher.  (Doc. 20, p. 4, ¶ O).  The plaintiff did not request any type of

accommodation during her interview.  (Doc. 15, p. 3 (citing Parsons Dep., p. 47[6]; Barber Dep., p.

34[7])).

      After the plaintiff's interview, Barber recommended that the Board hire the plaintiff.  The

Board subsequently voted and approved Barber's recommendation.  The plaintiff was then hired

for a one year probationary period.[8]  (Parsons Dep., p. 196; Def. Ex. 4).  The plaintiff was not

certified to teach art in public school, and was, therefore, required to obtain an Alternative

_____

[4] Although the duration of each of these employment periods is somewhat unclear from the record, the plaintiff clearly did not teach full-time at the majority of these positions as the dates overlap and sometimes the places of employment in one year are in different states.  For example, the plaintiff taught with the University of Alabama Youth Art Program from 1992-1995, but was in Florida at Coral Springs High School from 1994-1995.

[5] Barber does not remember the plaintiff telling her about the surgery.  For purposes of the present motion, however, the court assumes that she in fact told Barber.

[6] The plaintiff's deposition is located at document 16, tabs 1 & 2 and document 21, tab 4.

[7] Barber's deposition is located at document 16, tab 3 and document 21, tab 6.

[8] "Under Alabama law, for the first three years of their employment, teachers are non-tenured probationary employees who are employed on a one year contract.  *See* Ala. Code § 16-24-12; (Williams Aff. ¶ 3, Ex. A)."  (Doc. 15, p. 4).

3

Baccalaureate Certificate ("ABC certificate"). (Barber Dep., p. 171; Williams Dep., p. 44; Doc. 15, p. 3). A non-certified teacher may renew the ABC certificate once a year for a period of three years. (Williams Dep., p. 73). When a teacher applies to renew the ABC certificate, the superintendent must verify that the teacher completed the prior year satisfactorily and is being offered a position for the next year. (Williams Dep., p. 73). After a teacher receives the ABC certificate for three years, the next application is for a regular teaching certificate. (*Id.*).

### The 1998-1999 School Year

During the plaintiff's first year at Simmons, Barber became concerned with the plaintiff's ability to manage the classroom. (Barber Dep., p. 155). At some point during the year, a student turned on MTV in the plaintiff's classroom. The plaintiff told the student that MTV was not appropriate for the classroom. Thereafter, parents called Shipley and Barber to complain about their children watching MTV at school. (Shipley Dep., pp. 24-46; Barber Dep., pp. 98-101). Barber spoke to the plaintiff about the impropriety of watching MTV in the classroom. (Barber Dep., pp. 98-101; Parsons Dep., pp. 138-39). According to the plaintiff, MTV was only on the TV on one occasion. (Doc. 10, pp. 24-26).

Barber also noticed that the students in the plaintiff's classroom were often unruly, off task, and unfocused. (Barber Dep., pp. 85-87; *see also* Shipley Dep., pp. 47-49). Because the plaintiff was a non-certified, probationary teacher who had never taught middle school, Barber decided to renew her contract for the 1999-2000 school year with the hope that the plaintiff's classroom management skills would improve. (Barber Aff. at ¶¶ 6-7; Barber Dep., p. 155).

### The Plaintiff's Work Injuries

During the last two weeks of the 1998-1999 school year, the plaintiff fell on some beads

4

at school that had been placed there by students and injured her left forearm muscle and elbow. (Parsons Dep., pp. 61-62, 244). The plaintiff reported the injury to Jones and filled out an incident report. A Simmons' physical education teacher took the plaintiff to the doctor.

Thereafter, during the summer before the 1999-2000 school year, the plaintiff underwent a second surgery, after which she was unable to move and use her fingers for some time. (Doc. 20 at ¶ U). The plaintiff's arm was in a sling from her surgery at orientation for the new school year. Barber asked the plaintiff about her arm and commented that "[having one's arm in a sling was] [n]ot a good way to start the school year." (Parsons Dep., pp. 99-100).

In March 2000, the plaintiff fell over a piece of exercise equipment at school and hurt her arm while working on a project. (Doc. 20 at ¶ CC).

### The 1999-2000 School Year

Teachers at Simmons are required to submit lesson plans to their Assistant Principal every four to six weeks. The plaintiff believed that the lesson plans were required to be typed. She stated that, on one occasion, she was chastised when she turned in handwritten plans. Specifically, the plaintiff recalls the situation as follows:

Q.   Who did you request an accommodation from?

A.   Marilyn Jones.

Q.   And what did you ask Ms. Jones for?

A.   I told her that I would be happy to have someone, a secretary type my, what I had handed in to her if she would like, and she actually raised the issue with me that I had handed in some, something that was handwritten rather than typed. And did so at a team meeting in front of my colleagues.

Q.   What did you hand in to her that was handwritten?

5

A.      It was something of a curriculum or unit plan nature, or lesson plan . . .

Q.      Were you required to hand these in to Ms. Jones?

A.      Yes.

Q.      And did you hand it in to her in a timely manner?

A.      Yes.

Q.      And were you required to type them?

A.      They - required.  She had asked for them to be typed.

Q.      When . . . ?

A.      I don't recall . . .

Q.      Do you know when it was that . . . she said she wanted them to be typed, preferred them to be typed?

A.      Well, it was my second year of employment.  The first part of the year.  Roughly September.

Q.      Of '99?

A.      Of the '99/2000 school year?

Q.      Do you know, though, if they were required to be typed?

A.      I can't say.  I would assume so, upon her reaction to me having handed in a handwritten one.

Q.      When did you hand her a handwritten one?

A.      I put it in her box at her eighth grade office.

Q.      And what happened after you put it in her box?

A.      She came to the team meeting and said in front of my colleagues, you know - that I wasn't good enough and you're not good enough to sit down and type yours, you had to hand in a handwritten one.  And -

6

Q.    Were those her exact words, you're not good enough . . . ?

A.    Well, it might have been you're too good to type yours or it had like a, you know, you're, you have a highfalutin quality.  And she actually, you know, said that she, you know, you fine arts, you're a prima donna.

Q.    Did she use the word prima donna?

A.    Uh-huh . . . some of my colleagues responded that . . . don't you remember she had a cast on her hand and she couldn't type.

Q.    Did you hand in anymore unit plans which were handwritten . . . ?

A.    We were, as you earlier asked, required to every six weeks I believe, turn in something.  I don't recall if it was handwritten or not.

(Plaintiff's Dep., pp. 73-76).

On March 7, 2000, Jones performed an observation of the plaintiff's classroom.  Jones encouraged the plaintiff to perform a lesson with clay although the plaintiff was planning on waiting a few weeks for the clay lesson because she was under a doctor's care and could not lift more than twenty pounds.  Some of the students were able to lift the clay and the plaintiff completed the lesson.  (Doc. 20 at ¶ DD; Doc. 15, p. 7).

Sometime thereafter, the plaintiff asked Shipley to have someone help her operate some tools during the construction of an art project for the Alabama state art competition.  A science teacher agreed to help but was out of school on a field trip the day that the plaintiff needed help.  Instead, one of the student's parents helped.  (Doc. 15, p. 7; Doc. 20 at ¶ EE).

Throughout her two years at Simmons, the plaintiff never furnished Barber, the Board, or anyone at Simmons with a doctor's note or any documentation regarding any work restrictions or necessary accommodations.  Although the plaintiff alleges that her doctor recommended certain restrictions for the plaintiff, those "[r]ecommendations were made to [her]. [She stated,] It's [her]

7

affair whether [she] make[s] accommodations to the person.  It's not something you do in writing from a physician to an employer.  It's at [her] discretion."  (Parsons Dep., pp. 186-87).  The plaintiff states that she never presented any documentation of any work restrictions because "it was not asked of [her] to produce that."  (Parsons Dep., p. 188).

Also, during the 1999-2000 year, Barber required teachers to wear their shirts tucked in. Parsons was not able to do so for a while because she dropped a pan of hot butter, while trying to hold it with her left hand, and burned her stomach.  The plaintiff explained the circumstances to Barber.  She stated that the lack of muscle strength in her left hand caused her to drop the pan. (Doc. 20, ¶ Y; Parsons Dep., pp. 169-70).  The plaintiff was never disciplined for failing to tuck in her shirt.  (*Id.*).  On another occasion that year, the plaintiff went to Barber's office to let her know that she would not attend an after school meeting because she was not feeling well.  (Doc. 20, ¶ Z; Parsons Dep., p. 171).

Finally, during the second semester of the 1999-2000 school year, the plaintiff filed a written request for personal leave without pay.  (Parsons Dep., pp. 88, 115; Barber Dep., pp. 65-66).  The request was premised on her adverse reaction to taking cortisone that resulted in her becoming ill.  She believed she needed rest and time to see her doctor and dentist.  (Parsons Dep. at 88, 175-76).  About this time, the plaintiff's doctor, Edward D. Hillard, M.D., provided the plaintiff a letter that was received by the Board about May 8, 2000.  The letter stated as follows:

> This is to verify that Juliella Parsons has been under my care, having undergone a surgical procedure on her left elbow and wrist.  In addition to this she was recently treated for a problem with her hip.  The medication that Ms. Parsons takes in treatment of her conditions may have an effect on her affect.
>
> If I can provide additional information, please let me know.

8

(Parsons Dep., Ex. 7).  Her request for leave was denied and she was told that she would have to suffer through till the end of the year.  (Parsons Dep. at 88-89, 100).

**Observations & Evaluations**

On the March 7, 2000, evaluation, the plaintiff received three "needs improvement" marks in the area of classroom management.  Aside from those three "needs improvement" marks, the plaintiff received "acceptable" marks.  On the "Teacher Observation Form," Jones made the following comments in the areas where the plaintiff "needs improvement."  "Work to build better rapport with student in situations that cause anger.  Avoid raising voice; Enforce rules and expectations consistently such that [the] student know [sic] what to expect; Endeavor to make sure students are focused before beginning instruction; Avoid mass class consequence and work with individual consequences.  Avoid combative language."[9]

The plaintiff's second observation was on April 6, 2000.  In the usual situation, after both observations, the teacher meets with the administrator to discuss the observations.  (Barber Aff., ¶ 3[10]; Parsons Dep. at Def. Ex. 10).  The plaintiff met with Jones on April 20, 2000, at which time Jones commended the plaintiff on "reinforc[ing] . . . students' skill development through modeling techniques, monitoring individual performance, lending assistance and providing appropriate feedback . . .," and noted that she needed refinement on ". . . maintaining student focus throughout the period . . . [and] [a]void[ing] interacting with [a] student with negative body language and combative behavior."  (*See* "Post Observation Report for Certified Personnel," attached to the March 7, 2000, Teacher Observation Form).  During the meeting, the plaintiff

---

[9] The "Teacher Observation Form" is located at defendant's exhibit 9 to the plaintiff's deposition.

[10] Barber's affidavit is located at document 16, tab 8.

questioned Jones about what she meant by "negative body language." Jones then demonstrated

what the plaintiff did by making a fist "in an assaultive" manner and sitting in a particular way.

(Parsons Dep. at 118-19).  The plaintiff also met with Shipley concerning the negative evaluation

that Jones had prepared.  (*Id*. at 117).  The plaintiff told Shipley that she thought the evaluation

"was unfair and discriminatory based on the fact that [she had] a disability and it was a violation

of the A.D.D. [sic] and . . . [she] wanted to give Marilyn Jones the opportunity of changing it or

taking it away."  (*Id*.).  Jones did not alter the report.  (*Id*.).

At the end of every school year, the Principal and Administrator conduct a teacher

evaluation of the non-tenured probationary teachers.  (Barber Aff. at ¶ 4).  The plaintiff's

evaluation was on May 3, 2000.  The plaintiff received "acceptable" remarks throughout her

evaluation except in the area of classroom management, where she again received three "needs

improvement assessments."  In the "teacher comments" section, which the plaintiff signed and

dated, the report stated:

> Miss Parsons suggests that classroom management or judgment was somewhat
> affected by an injury that required medication which adversely affected her health.
> Sometimes mobility was limited by the injury resulting in a cautious movement
> about the class.  Distance traveled each day to work interfered with preparation
> time for classwork.

(Parsons Dep., Def. Ex. 10, p. 3).  Additionally, the administrator commented:

> Miss Parsons's strength lies in her ability to involve a broad range of students
> with varying abilities and interests in productive projects.  She displays each
> student's work in visible areas of the school each marking period.  An area of
> needed improvement is managing individual student behavior and sustaining class
> focus and momentum simultaneously.  Individual misbehavior is sometimes
> personalized escalating into whole class consequences and paralysis.

(*Id*.).  Thereafter, on May 8, 2000, the plaintiff gave Barber a note from her doctor, dated April

10

24, 2000, that read:

> This is to verify that Juliella Parsons has been under my care, having undergone a surgical procedure on her left elbow and wrist. In addition to this, she was recently treated for a problem with her hip. The medication that Ms. Parsons takes in treatment of her conditions may have an effect on her affect.

(Parsons Dep., Def. Ex. 7).

### Plaintiff's Non-Renewal

Sometime prior to May 8, 2000, Barber decided to recommend non-renewal of the plaintiff's contract to the Board. (Barber Aff. at ¶ 10; Barber Dep., p. 106). Barber made her recommendation to Williams and Farr, and Farr presented the recommendation to the Board. The Board approved the recommendation and on May 23, 2000, Barber presented the plaintiff with a letter informing her that her contract would not be renewed at the end of the school year. (Doc. 15, p. 10 (citing Defendant's Response to Plaintiff's Interrogatories, No. 8[11])).

Subsequent to the plaintiff's departure, Heather Jones was hired as an art teacher. (Shipley Dep. at 27-28; Jones Dep. at 35-36). She was in her twenties and was hired soon after her graduation. (*Id.*). This was contrary to what the plaintiff had been told by Williams.

The plaintiff filed a charge of discrimination with the EEOC on August 25, 2000, alleging that she was discriminated against when she was non-renewed because she was a "mature female" and had a "disability." (Parsons Dep., pp. 209, 211; Def. Ex. 12 & 13).

### MOTION FOR SUMMARY JUDGMENT

#### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to

---

[11] The defendant's responses are found at document 16, tab 7.

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided by trial.  Only when that burden has been met does the

burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact

that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142

(1970).

     The movant can meet this burden by presenting evidence showing there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at

322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met its burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324.  The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings.  *Id*.

     After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are

12

irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

## Discussion

## Disability Discrimination under the ADA

The plaintiff alleges that the defendant discriminated against her in violation of the ADA when it made its decision not to renew her contract. She specifically alleges that "[She] is a disabled person . . . in that (a) she has a physical impairment; (b) she has a record of such impairment; and (c) she is regarded as having such an impairment. Her employer failed to accommodate her as recommended by her physician, as requested by plaintiff, and as required under the **ADA**, and, in express violation thereof, wrongfully discharged her." (Doc. 1 at ¶ 26) (emphasis in original).

The ADA states that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (2000). To establish a prima facie case of disability discrimination, the plaintiff "must demonstrate that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000), citing 42 U.S.C. § 12112(a) and *Gordon v. E.L. Hamm & Assocs., Inc.,* 100 F.3d 907, 910 (11th Cir. 1996); *Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999).

13

The familiar burden-shifting analysis of Title VII employment discrimination actions is applicable to the plaintiff's ADA claim. *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied,* 519 U.S. 1118, 117 S. Ct. 964, 136 L. Ed. 2d 849 (1997). If the plaintiff is able to establish a *prima facie* case, the defendant will be afforded an opportunity to articulate its purported legitimate, nondiscriminatory reason for its action. Once the defendant has proffered its legitimate, nondiscriminatory reason, the plaintiff may call the defendant's proffered reason into question by offering evidence that the defendant's stated reason is merely a pretext for unlawful employment discrimination.

As noted by the court in *Richio v. Miami-Dade County,* 163 F. Supp. 2d 1352, 1359 (S.D. Fla. 2001):

> . . . . A crucial component in alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 325 n.5, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).
>
> In establishing unlawful motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). . . .

*Richio,* 163 F. Supp. 2d at 1359-60.

In the typical scenario, the initial inquiry is whether the plaintiff's medical condition constitutes a disability under the ADA. Indeed, in the instant case, the defendant argues that the plaintiff cannot establish a prima facie case because she has not shown that she has a disability within the meaning of the ADA.

## No disability within the meaning of the ADA

A disability is defined under the ADA and the pertinent regulations as "(A) a physical or

14

mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see* 34 C.F.R. § 104.3(j)(1). Suffering from a physical impairment is not necessarily a disability as that term is defined by the ADA. *See, e.g., Hilburn*, 181 F.3d at 1226 ("[A] physical impairment alone is not necessarily a disability under the ADA."). Instead, the impairment must substantially limit a major life activity. *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2454, 138 L. Ed. 2d 211 (1997). "Major [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Cash*, 231 F.3d at 1305, citing 29 C.F.R. § 1630.2(i).

> "To be substantially limited in the major life activity of 'working,' the individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training skills and abilities. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278 (11th Cir. 1997); *Pritchard*, 92 F.3d at 1133; 29 C.F.R. § 1630.2(j)(3)(i). 'Although a plaintiff seeking recovery under the ADA, is not required to prove a comprehensive list of jobs which [he] cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment.' *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 858 (11th Cir. 1998). An impairment does not substantially limit the ability to work merely because it prevents an individual from performing either a particular specialized job or a narrow range of jobs. *Id.* Nor does the inability to perform a single, particular job constitute a substantial limitation in the major life activity of working. *Id.* 'The inquiry is whether . . . the particular impairment constitutes for the particular person a significant barrier to employment.' *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir. 1986); *see also Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) ('To be substantially limited in the major life activity of working, an individual must be precluded from more than one type of job, even if the job foreclosed is the individual's job of choice.'); *Jasany v. United States Postal Service*, 755 F.2d 1244 (6th Cir. 1985) (postal clerk with mild case of crossed eyes that caused him to develop eye strain and headaches after operating a particular machine was not substantially limited in working because he was capable of working at other jobs

within the post office); *Mustafa v. Clark County School Dist.*, 876 F. Supp. 1177 (D. Nev. 1995) (teacher whose anxiety disorder prevented him from working in a classroom was not substantially limited in his ability to work because he was not precluded from employment in general).

*Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1351-52 (S.D. Fla. 2001).

In *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1220-21 (N.D. Ala. 2002), the court stated as follows:

> Prior to January 2002, case law made satisfaction of a prima facie case under the ADA, particularly meeting the "disability" prong, relatively simple. On January 8, 2002, however, the Supreme Court significantly altered the definition of "substantially limits a major life activity." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).
>
> In *Toyota* the Supreme Court reversed the Sixth Circuit decision that found a former employee disabled because she could no longer perform all her manual tasks at work due to carpal tunnel syndrom. *See Toyota*, 534 U.S. at ----, 122 S. Ct. at 689. Curtailing previous case law defining "major life activities," the Court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.*, 122 S. Ct. at 691. Specifically, the Court stated that "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, [12] not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 693.
>
> As a result, this decision creates additional obstacles for many plaintiffs in disability cases, particularly those alleging discrimination in the workplace. Under *Toyota* it appears that courts now have greater discretion in determining what is a major life activity and what interference with that activity is substantial enough to constitute a disability.

---

[12] "The Court noted that testimony that the Toyota plaintiff could brush her teeth, wash her face, bathe, tend her garden, fix breakfast, do laundry, and pick up around the house was the very type of evidence the Sixth Circuit should have focused on, as these seemed the type of manual tasks of central importance to people's daily lives. *See Toyota*, 122 S. Ct. at 693." *Stedman*, 219 F. Supp. 2d at 1220 n.18.

**Plaintiff's lack of a disability under the ADA**

The plaintiff attempts to establish that she has a "disability" by asserting that her ulnar nerve palsy, or "claw hand," "limits her ability for sensory perception and range of motion and dexterity in her left hand and arm." (Doc. 20, p. 20).  She further alleges that the ulnar nerve palsy is permanent and that she is limited in that she "no longer lifts things with her left hand without having to use her right arm to support it;" "she cannot drive a stick shift or perform certain types of housework;" she "cannot perform fine finger movements, such as typing, sorting paper, and retaining her grasp on an object;" she "is unable to simply sit and not hold her hand or have a relaxed demeanor;" and "she had to forego being an actress and dancer."  (*Id.*, citing Parsons Dep., pp. 59-60, 71, 72).

Beyond the allegation that her "claw hand" "substantially limits her ability for sensory perception and range of motion and dexterity in her left hand and arm" (doc. 20, p. 20), the plaintiff has failed to specify which of her major life activities is substantially limited, or offer evidence of any such limitations.  In fact, as the defendant points out, the plaintiff admits she is still able to work, sit, stand, paint, commute from Tuscaloosa to Birmingham, and work as an art teacher and artist, as well as wash and dry her hair, cook, and clean house. (Parsons Dep., pp. 58-59).

While the plaintiff summarily concludes that her diagnosis of ulnar nerve palsy meets the first element of a prima facie case of disability discrimination, the evidence establishes that the plaintiff is quite capable of performing all of her major life activities, despite her condition.  The court does not find the plaintiff's conclusory statements in her brief sufficient to overcome the defendant's assertion that she did not have a disability as that term is defined by the ADA.  In

17

fact, the plaintiff has not established a single major life activity that she cannot do. While the plaintiff testified that typing is difficult for her (she can only type 25 words per minute), she has trouble lifting objects with her left hand without the aid of her right hand for support, she cannot do certain types of housework, she cannot dance, and she cannot drive a stick shift, "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Toyota Motor Mfg.*, 534 U.S. at 197.

The evidence in this case does not show that the plaintiff cannot perform the type of manual tasks of central importance to daily life, such as brushing her teeth, washing her face, fixing meals, doing laundry, walking, or other manual tasks central to an individual's life, nor does it show that she cannot see, hear, speak, breathe, or work. While this list is not exhaustive, it does provide some guidance as to the types of things a plaintiff must be limited in doing to be able to establish that she has a "disability."

After considering the evidence in this matter, the court finds that the plaintiff has not satisfied the disability element of the ADA as articulated in § 12102(2)(A). She has not shown that her situation substantially limited one or more of her major life activities at the time of her non-renewal by the defendant. Though the plaintiff clearly suffers some impairment, that impairment does not rise to a disability as defined by the ADA in that it does not render her physically unable to care for herself or to function in a major life activity. The court, therefore, finds that the evidence does not present a genuine issue of material fact regarding whether the plaintiff suffers an impairment that substantially limits a major life activity.

### No record of a disability/Not regarded as disabled

Because the plaintiff cannot show that she has a disability, to overcome the defendant's

18

motion for summary judgment she must show that either the defendant perceived her as being impaired or that she has record of an impairment.[13]  To show that the defendant regarded her as having an impairment, the plaintiff must establish that she has a physical or mental impairment that does not substantially limit major life activities but is treated by the defendant as if she did, or she has a physical or mental impairment that substantially limits a major life activity only as a result of the attitudes of others toward such impairment.  *Todd v. McCahan*, 158 F. Supp. 2d 1369, 1379 (N.D. Ga. 2000) (citing *Hilburn v. Murata Electronics of North America, Inc.,* 17 F. Supp. 2d 1377, 1382 (N.D. Ga. 1998)).

Nothing in the record demonstrates that the defendant treated the plaintiff as though she were disabled.  It is not enough that an employer knows that the employee suffers from an impairment to show that there is a perception of disability, nor is it sufficient that the employee informs the employer that the impairment causes difficulties on the job.  *Blackston v. Warner-Lambert Co.*, 2000 WL 122109, *4 (N.D. Ala. 2000).

The evidence in the record does not reflect a single co-worker that regarded the plaintiff as disabled.  What is reflected is a general knowledge that the plaintiff was in some sort of accident and that she had surgery on her arm.[14]  As discussed above, there is no evidence that the

-----

[13] The plaintiff does not argue that she fits within either of these categories; however, for completeness, the court will address their applicability.

[14] Specifically, Barber states that, although she does not recall the plaintiff mentioning her left arm in particular, she does remember her mentioning to her that she had been in an accident "because she [(the plaintiff)] was trying very hard to convince [her] that it [(her impairment)] would not have any implications with her job . . . ."  (Barber Dep., pp. 32-33).  Jones testified that she did not know that the plaintiff had "some condition . . . that gave her some physical problems with her arm," but that she "knew later on . . . when she had her arm in a sling the second year that she had an earlier accident and had been injured," but that the first time she remembered the plaintiff talking to her about limitations was when "she gave a note from a doctor" after the evaluation in which Jones commented on the plaintiff's body language.  (Jones Dep., pp. 19-21).  Lastly, Shipley testified that she was not aware that the plaintiff had any type of "physical disability or impairment" at the time she came to work at Simmons.  (Shipley Dep., pp. 33-34).  She became aware of an impairment when she observed her wearing an arm

(continued...)

plaintiff did suffer from an impairment that affected a major life activity so as to constitute a disability. Likewise, the evidence does not demonstrate that the defendant treated her as though she were disabled.

The plaintiff also fails to offer any evidence tending to show that she had any record of an impairment. To show that she had a record of a disability, "Plaintiff must show that [s]he was classified or misclassified as having a physical or mental impairment that substantially limits one or more major life activities . . . [and that] the employer was aware of the record in question." *Todd*, 158 F. Supp. 2d at 1378 (citing 29 C.F.R. § 1630.2(k)). In discussing the term "record of disability," one court in this circuit has stated:

> . . . . An individual with a record of disability is a person who "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k) (1998). One purpose of this provision is to prevent discrimination against individuals because of a history of disability. *See* 29 C.F.R. pt. 1630, App. § 1630.2(k) (1998). For example, this provision would protect a former cancer patient from discrimination based on that prior medical history. *See id*. The other purpose is to ensure that individuals are not discriminated against because they have been misclassified as being disabled, such as a person who is erroneously classified as having a learning disability. *See id*.
>
> To establish a claim under the ADA based upon a record of disability, a plaintiff must show that at some point in the past, the employer relied upon a record which either classified or misclassified that individual as having a physical or mental impairment that substantially limits a major life activity. *See Hilburn*, 181 F.3d at 1229. There are several types of records upon which an employer could rely, including education, medical or employment records. *See* 29 C.F.R. pt. 1630, App. § 1630.2(k) (1998).

*Phillips v. Wal-Mart Stores, Inc.*, 78 F. Supp. 2d 1274, 1286-87 (S.D. Ala. 1999), *aff'd*, 220 F.3d

---

[14](...continued)

sling during a school year. (*Id*. at 34-37). Shipley recalls that the plaintiff told her she had been in a car wreck in the early 90's but she did not recall the plaintiff ever referring to her injury as a disability or ever mentioning any limitations that she had. Furthermore, other than the fact that the plaintiff's arm was in a sling for some time, her injury was not visible to Shipley. (*Id*. at 34-37).

593 (11th Cir. 2000). Because the plaintiff has failed to show any record of her impairment or

that the defendant regarded her as having an impairment, she has failed to establish the first

element of her ADA claim.[15]

**Plaintiff was not discriminated against**

The defendant next asserts that even if the plaintiff could establish that she has a

"disability," she cannot make her *prima facie* case because she cannot show that she was

discriminated against because of her disability. (Doc. 15, p. 17). Specifically, the defendant

states that the plaintiff never requested any type of accommodation. The plaintiff, however,

points to several instances in which she alleges that she did request accommodation. First, the

plaintiff contends that the situation wherein Jones came to her room to perform an evaluation and

insisted the plaintiff to do a lesson with clay somehow amounts to a request for accommodation.

However, the court cannot conceive of how that situation amounts to a request for an

accommodation under the ADA. Even if the request was the fact that the plaintiff could not lift

the clay, by the plaintiff's own testimony, the request was granted because a student lifted the

clay for her. (Parsons Dep., p. 82). Regardless, the court is disinclined to classify the situation as

a request for accommodation.

The plaintiff next argues that she requested an accommodation by asking Shipley to find

someone to help her with construction of an art project. Again, by the plaintiff's testimony,

Shipley found a male science teacher to assist her. (Parsons Dep., p. 86). The fact that the

teacher later was not available when the plaintiff needed him does not undermine the fact Shipley

---

[15] The plaintiff, as noted, does not assert in her brief that there was a record of such impairment or that she was regarded as having such an impairment. (Doc. 20, p. 20). She merely asserts that she had "a physical impairment that substantially limits her ability for sensory perception and range of motion and dexterity in her left hand and arm." (*Id.*).

21

found someone who was willing to help.[16]  Again, however, the court does not find her request for help to operate power tools is a request for accommodation as contemplated by the ADA. Certainly, the operation of power tools in this situation is not a fundamental requirement of the plaintiff's employment.

The plaintiff also argues that she requested an accommodation when she asked Jones if she could get help typing her lesson plans.  However, the undisputed evidence shows that Jones did not require that the teachers type their lesson plans.  (Barber Dep., p. 51; Jones Dep., p. 32). Even if Jones had required that teachers type lesson plans, and even if Jones did chastise the plaintiff for not typing the lesson plans, such conduct may have been embarrassing for the plaintiff and may have been improper, but it was not discrimination on the basis of a disability. Jones' chiding that the plaintiff was a "prima donna" and "too good to type her lesson plans" (Parsons Dep., pp. 73-76), does not constitute discrimination on the basis of the plaintiff's alleged disability.

Lastly, the plaintiff contends that she was denied a request for two weeks of personal leave without pay so that she could rest and go to doctor and dentist appointments.  (Doc. 20, p. 23; Parsons Dep., p. 88).  The plaintiff asserts that she presented a doctor's note that explained the reasons for her adverse reaction to cortisone.  (Doc. 20, p. 23).

The record demonstrates that she did not present a note from her doctor to the effect that the leave was necessary, nor was the request necessarily related to her alleged "disability."  The note merely stated that the plaintiff was taking medication following her surgery and for a problem with her hip.  (Parsons Dep., Ex. 7).  It also stated that the medication "may have an

---

[16] A parent that was present ended up assisting with the project.

effect on her affect." (*Id.*). The letter did not request any accommodation. Additionally, the court cannot see how a request to the extent it seeks leave to go to a dentist could possibly relate to the impairment in her hand and arm.

Notwithstanding all of the plaintiff's allegations regarding her requests for "accommodations," the plaintiff simply cannot establish a prima facie case because she cannot show that her impairment rose to a disability under the ADA. Accordingly, the defendant's motion is due to be granted on the plaintiff's ADA claim.

### Defendant's legitimate, nondiscriminatory reason for its actions

Even if the plaintiff had demonstrated a *prima facie* case, the plaintiff has not demonstrated that the defendant's legitimate, nondiscriminatory reason for its non-renewal of her contract, is pretext for its unlawful motives. In *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998), the court stated:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan,* 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker,* 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference

23

> of intentional discrimination from the plaintiff's prima facie case taken together
> with rejection of the employer's explanations for its action.  At that point,
> judgment as a matter of law is unavailable.

In the present case, the plaintiff has not offered "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Id.*  Instead, the plaintiff acknowledges that she slept on the job, although not while students were present; one parent complained about her; she had an unruly classroom on one occasion, although it was Jones's fault; and, that MTV was on in her classroom on one occasion as a result of one student's actions.  (Doc. 20, pp. 24-26).  However, throughout the plaintiff's employment, Barber personally observed the plaintiff and heard from Assistant Principals Shipley and Jones that the plaintiff could not keep her students on task, redirect the students, or hold their attention.  (Jones Dep., pp. 43-48; Barber Dep., pp. 85-87; Barber Aff. ¶¶ 5-8).  Both Barber and Assistant Principal Shipley stated that they received complaints from parents about the plaintiff's abilities.  (Shipley Dep., pp. 24-25, 46-49; Barber Dep., pp. 67-71, 98-100).

The plaintiff argues that her evaluations are evidence that the defendant's reason for not renewing her contract is pretextual.  Barber testified that it was "rare that a non-tenured teacher receive[s] any 'needs improvement' [ratings] on their end of the year evaluation."  (Barber Aff. at ¶ 4).  Barber explained that the plaintiff's first year evaluation did not reflect any "needs improvements" because she felt like the plaintiff was making progress and wanted to give her the benefit of the doubt, rather than "blow[ing] her out of the water at the end of the year because

24

[she knew the plaintiff] was trying."[17]  (Barber Dep., p. 169-70).  Although Barber "had some concerns at the end of the first year . . . [and the plaintiff] had some difficulties, . . . she was working toward making improvement . . . we were working toward progress."  (*Id*. at 155). Because Barber was trying to give the plaintiff the "benefit of the doubt," and thought the "progress would continue," the plaintiff received a positive first year evaluation.  (*Id*. at 156-57). This does not demonstrate pretext.  To the contrary, it demonstrates that the defendant, and its agents, were attempting to work with the plaintiff.

The plaintiff does not present any evidence to the contrary.  The plaintiff's disagreement with the Board's reasons for terminating her is simply not enough to show pretext.  *See Combs*, 106 F.3d at 1543 ("Federal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here the reason, at least is one that might motivate a reasonable employer.").

To the extent that the plaintiff makes much ado over the fact that there is no documentation or records of complaints made by other faculty, students, or parent, the court is not impressed.  (*See* Doc. 20, pp. 24-25).  There is no requirement that complaints be written or documented in a particular way.  Although that fact should be, and herein is, considered by the court, it is not sufficient to show pretext under the circumstances.

---

[17] The plaintiff's first year evaluation reflects that "Miss Parsons has shown tremendous progress during this first year at Simmons Middle School.  Initially showing the anxiety and stress of adjusting to a new situation she now appears less overwhelmed and the tremendous amount of projects displayed by the students she teaches reflects this new confidence." (Barber Dep., Ex. 6 at 3).

## Retaliation under the ADA

To establish a prima facie case of retaliation under the ADA, the plaintiff must show (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) a causal link between the adverse employment action and the protected activity. *See Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249 (11th Cir. 2001); *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir. 1997). In support of her retaliation claim, the plaintiff again alleges that she requested accommodations on several occasions, but her requests were denied, and that denial of her requests affected her ability to perform her duties as an art teacher, causing her to suffer an adverse employment action. (Doc. 20, pp. 28, 29). Ultimately, the plaintiff argues, the defendant made the decision not to renew the plaintiff as a "way to address Ms. Parsons' need for accommodation once and for all." (Doc. 20, p. 29).

The defendant argues that the plaintiff cannot establish that she engaged in a protected activity, and, therefore, cannot establish a prima facie case of retaliation. (Doc. 15, p. 20). In fact, the plaintiff admits that she never requested any specific accommodation from any of the decision makers in this case. (Parsons Dep., pp. 47, 115, 186-87). At most, the plaintiff told Shipley that she needed help putting together an art project, told Jones she needed help lifting clay, asked Jones if her lesson plans had to be typed, and presented Barber with a doctor's note that merely stated that the plaintiff had an adverse reaction to some medicine that she was taking. (Parsons Dep., pp. 74-81, 84-89). From the plaintiff's deposition testimony, it is clear that she felt that it was up to her, not a doctor or other health care provider, to request an accommodation. (*Id.* at 186-87).

26

Although the plaintiff might subjectively believe that the aforementioned requests amount to requests for accommodation, the court disagrees. The plaintiff has offered no evidence that any of the requests she made were necessary in order for her to perform her job or that any of those requests improperly were denied. The plaintiff bears the burden of identifying the requests for accommodation that she was denied and establishing that the requested accommodations would have allowed her to perform the essential functions of her job. *See Stewart*, 117 F.3d at 1286.

Furthermore, because the plaintiff has not established a reasonable, good faith belief that she has a disability under the ADA, any denial of her purported requests for accommodation does not constitute retaliation under the present circumstances. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) ("[T]o satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute.").[18]

### Age Discrimination under the ADEA

The ADEA prohibits an employer from discharging an employee because of her age if she is at least 40 years of age. A plaintiff may establish a *prima facie* case of age discrimination by (1) providing direct evidence of discriminatory intent by the defendant, (2) presenting statistical proof of a pattern of discrimination by the defendant, or (3) providing other circumstantial evidence.

---

[18] The court does note that "[a] plaintiff engages in 'statutorily protected expression' even when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Kennedy v. Kelly Temporary Services, Inc.*, 95 F. Supp. 2d 1288, 1296 (M.D. Ala. 2000) (citing *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997)).

To establish a *prima facie* case of age discrimination based on circumstantial evidence the plaintiff has the burden to prove: (1) that she is a member of the protected group; (2) that an adverse employment action was taken against her; (3) that she was treated less favorably than otherwise similarly situated employees or replaced by or lost the position to someone "substantially younger;" and (4) that she was qualified for the position for which she was rejected. *Chapman v. A1 Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1347-48 (11th Cir. 2000); *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1359 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000); *Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 656-67 (11th Cir. 1998). Under the familiar *McDonnell-Douglas* framework, once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions. *Combs*, 106 F.3d at 1527-28. Once the defendant meets its burden of production, the plaintiff is afforded an opportunity to demonstrate that the defendant's proffered reason was not the true reason for the employment decision. *Combs*, 106 F.3d at 1528.

For summary judgment purposes, the defendant assumes that the plaintiff can meet her prima facie case. However, the defendant argues that the plaintiff cannot rebut its legitimate, nondiscriminatory reasons for her non-renewal, specifically that she did not have the classroom management skills necessary for a middle school art teacher. (Doc. 15, p. 13). As set out previously, Jones was "insecure" about the "environment" in the plaintiff's classroom and felt like the plaintiff was not able to keep her students on task, redirect the students, or hold their attention. (Jones Dep., pp. 33-38, 42-43, 47-48). Shipley received several complaints from

parents about the plaintiff and observed that the plaintiff's classroom generally lacked order. (Shipley Dep., pp. 24-25, 46-49).  Parents complained to Barber that students watched MTV in the plaintiff's class and that the plaintiff had fallen asleep in class.  (Barber Dep., pp. 67-71, 98-100).  Additionally, Barber observed, and heard from her assistant principals, that the plaintiff's class was often unruly, out of control, and unmanageable.  (Barber Dep., pp. 85-87; Barber Aff. at ¶¶ 5-8).

The defendant does not dispute that the plaintiff has a strong background in art, but maintains that the plaintiff simply did not have the ability to manage a middle school classroom. The defendant points out, and the court notes, that at her deposition, the plaintiff compared some of the "adult females" she worked with to the middle school children, which she defined as "adolescent, pubescent, immature children."  (Doc. 20, p. 15; Parsons Dep., pp. 142-43). Further, Barber testified that she had concerns about the plaintiff's ability during her first year of teaching, but gave her the benefit of the doubt and recommended her renewal for a second year.

The plaintiff asserts that she has met the elements necessary for a prima facie case and goes no further.  (Doc. 20, pp. 26-27).  In the absence of any specific evidence of pretext, the defendant is entitled to summary judgment on the plaintiff's age discrimination claim.  As stated previously, the plaintiff's disagreement with the Board's reasoning for terminating her is simply not enough under the circumstances to demonstrate pretext. *Combs*, 106 F.3d at 1543.[19]

_____

[19]  The defendant also points out that all of the people involved in the decision not to renew the plaintiff are within the plaintiff's protected age group and that five out of the seven Board members that approved the plaintiff's non-renewal are actually older than the plaintiff.  A former judge of this court previously has recognized that people within a protected group are less likely to discriminate than people outside of that group. *See Langston v. Carraway Methodist Hosp.*, 840 F. Supp. 854, 866 (N.D. Ala. 1993) (J. Nelson) ("Furthermore, the fact that six of eight members of the reorganization committee were within the protected age group coupled with the fact that the two ultimate decision makers were ages 59 and 82, suggests, not that they were likely to discriminate but, in fact, suggests the opposite.  Those who are themselves within a protected group are less likely to discriminate than are those outside the group. *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466 (11th Cir. 1991) (persons inside a

(continued...)

        In the plaintiff's statement of the facts she asserts that she was discriminated against

based on her age and then cites to the fact that the teachers at the "school had a social club made

up of single women in their twenties and Christine Shipley." (Doc. 20, p. 15 (footnote omitted)).

She further states that "Shipley made a statement to Ms. Parsons about the group's twenty-ish

age and their marital status and Ms. Parsons replied, "Well, oh, I'm not in that age group. . . .

Thereafter, Ms. Parsons told Mrs. Shipley her age and she was surprised. . . . Mrs. Shipley's

behavior toward Ms. Parsons changed after this conversation. . . . " (*Id*. at 15-16 (record

references omitted). The court finds this evidence insufficient as a matter of law to overcome the

defendant's motion for summary judgment. It does not demonstrate pretext sufficient to require

that the matter be resolved by a jury.

## CONCLUSION

        Premised on the foregoing, the defendant's motion for summary judgment is due to be

granted. An order in accordance with the court's findings will be entered contemporaneously

herewith.

        **DONE**, this 30th day of April, 2004.

                                        _____
                                        **JOHN E. OTT**
                                        United States Magistrate Judge

---

[19](...continued)

protected group are more likely to be victims of discrimination than its perpetrators)"). However, the court does not find this
sufficient on its own to warrant the granting of the defendant's motion for summary judgment.

30